BROWNING, J.
Keith Darryl Lee (Lee) appeals from a final judgment and sentence for premeditated first -degree murder. Lee raises three issues, all of which merit discussion: 1) whether the trial court erred by preventing a defense witness from giving testimony conflicting with testimony of a crucial state witness; 2) whether the trial court erred by allowing a state witness, a police officer, to testify that Lee “appeared to have something on his mind that he appeared to want to talk to somebody about”; 3) and whether the trial court erred in preventing Lee from testifying that he had entered a plea to previous felony charges rather than submit to trials. Concluding the first ground has merit, we reverse and address the other two grounds, as harmless error on this record, for guidance to the trial court upon Lee’s retrial.

*977
FACTS

On the night of November 12, 1978, Herman Dennard (Dennard) was stabbed to death while seated in a ear. The physical evidence indicated that there were either two assailants or that one killer used two knives. The absence of defensive wounds indicated someone restrained Dennard while the attack progressed.
Sergeant Cassady (Cassady), one of the officers investigating the murder in 1978, knew that shortly before Dennard was killed, his wife, Annie Mae Silas (Silas), had announced her intended marriage to Leroy Benion, and Cassady testified Silas was a prime suspect. Lee was questioned during the 1978 investigation but was not arrested, and the case remained open and basically inactive until February 3,1995.
On February 3, 1995, Lee was arrested with an open container outside a liquor store. When Lee was brought into the police station, Cassady was working as the desk sergeant. At trial, there was some dispute as to whether Cassady or Lee first brought up the 1978 murder and Lee’s ability to “solve” it. Cassady testified that Lee spoke to him first, saying “I believe you tried to put a murder on me one time,” and “I could solve that murder for you tonight.” Cassady responded that he would talk to Lee later. However, Lee testified that Cassady spoke to him first, and that Cassady “jumped up from the table and went to the back to bring out the warrant I was brought in for and he brought back the file pertaining to the murder.” Lee said Cassady “asked me am I willing to help him with this murder,” to which Lee responded “man, I don’t know nothing about this murder ... I ain’t got nothing to say about this murder, man, because I don’t know nothing about it.” Cassady then stated “well, can I come see you later?” Lee responded “well, man, I’m drunk ... I really don’t want to talk about it,” and the dialogue temporarily ended.
At 1:20 A.M. on February 4,1995, Cassady and Detective Doyle (Doyle) took Lee’s taped statement regarding his knowledge of the murder. At trial, Cassady testified, over defense objection, that Lee “appeared to want to talk” (before giving the taped statement). Lee testified that before the tape recorder was turned on, Cassady told him about the murder and demanded he solve it. Cassady and Doyle told Lee that if he did not help solve the murder, they would pin it on him. Lee also testified he had made the taped statements, including an untrue statement that his brother had been killed, because he was “tired, delirious, and wanted to get out of there,” and he got the details for the taped statement either from Cassady or from reading news accounts of the murder.
Alberta Smith (Smith) was interrogated at the time of the murder and told police she did not see anything. However, in 1995, after reading about Lee’s arrest in the newspaper, Smith contacted the police and told them she had seen David McNeil (McNeil), Lee, and Dennard in a ear in front of her apartment building on the night of the murder. She stated she saw McNeil exit the front passenger seat, Lee exit the right rear seat, and both run away. Smith testified: 1) that she lied to the police the night of the murder because she was instructed to do so by her boyfriend’s mother. She had been living with her boyfriend and his mother, and she was afraid of her boyfriend, who beat her; 2) that she had previously described the car as blue, because Dennard and Silas had two cars, one blue and one white, and Den-nard and Silas had only recently obtained the white car; and 3) that in 1978, she experienced depression, concentration problems, confusing thoughts, and was taking medication. Since 1978, she had experienced voices “telling her to do things.”
On March 28, 1995, another Escambia County jail inmate, Charles Kyles (Kyles), who testified he had been convicted of 20 felonies, met with Doyle. As a result of this meeting, Kyles was equipped with hidden recording and transmitting equipment and engaged conversations with Lee. Kyles testified about his conversations with Lee. When asked whether Lee ever said he committed the murder, Kyles testified, over a defense objection, that “he just said he did it and he just said they didn’t have a weapon, they couldn’t find the weapon, so they wouldn’t pin it on him.” Lee’s alleged “confession” was not part of the taped conversation. *978 Kyles also testified that in 1978 or 1979, McNeil told Kyles that McNeil had killed Dennard and that in 1978, Silas had offered Kyles $1,500 to kill Dennard.
Lee’s testimony contradicted that of Kyles. Lee testified that the only thing he told Kyles about the Dennard murder was that he assumed McNeil had done it, but, he did not know, because he was not there. Lee also described his own criminal record, stating he had been convicted of nine felonies and had entered pleas to all of those charges. However, the state objected to the admission of that testimony. The objection was sustained.
McNeil testified that he had neither killed Dennard nor been hired to kill him, and that Lee had not killed Dennard or participated in the killing, as far as he knew. The defense sought to ask McNeil whether he told Kyles he was involved in the Dennard murder, but the trial court ruled the question was irrelevant and went to collateral impeachment.

IMPEACHMENT TESTIMONY

Lee’s first ground has merit. At trial, the State’s theory was that Lee and McNeil killed Dennard at the request of Dennard’s wife, Silas. Kyles supported that theory by testifying that both Lee and McNeil told him they committed the murder, and that Silas tried to hire Kyles to commit the murder. This theory necessitated the defense’s attacking Kyles’ credibility, as it was crucial. Silas contradicted Kyles by testifying she never tried to hire him. Lee contradicted Kyles by denying he told Kyles he committed the murder. Although McNeil testified that he did not kill Dennard, he was not allowed to testify that he never told Kyles he had killed Dennard. Kyles’ testimony that McNeil admitted the murder directly supported the State’s theory. McNeil’s excluded testimony contradicting Kyles went to a central issue. The trial court’s ruling that such testimony would be impeachment on a collateral issue was error. State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Thus, a determination must be made as to whether the error was “harmless.”
A defendant has a constitutional right to confront witnesses. U.S. Const amend. VI. Constitutional errors, with rare exception, are subject to harmless error analysis. State v. DiGuilio, 491 So.2d 1129, 1134 (1986). “The harmless error test places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict, or, alternatively, that there is no reasonable possibility that the error contributed to the conviction.” Id. at 1135. “The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.” Id. at 1139.
In this case, it cannot be said, beyond a reasonable doubt, that the error did not affect the verdict. The State had the testimony of Kyles and Smith, and Lee’s contradictory statements. Smith denied knowledge of the murder at the time of its commission; made contradictory statements as to the col- or of the car in which the murder took place (and from which she said she saw Lee exit); and admitted that, at the time of the murder and since that time, she experienced concentration problems, confusing thoughts and depression; had been taking medication; and heard voices telling her “to do things.” Clearly, the jury could have considered her testimony non-credible. Similarly, Kyles’ testimony could be considered non-credible because of his obvious interest in currying favor with the State. As a whole, the evidence left enough room for doubt so that any prejudicial error could have tipped the balance. Thus, not allowing Kyles to be properly impeached created a reasonable possibility that the verdict was affected.
To meet its burden under DiGuilio, the State argues that the issue was not preserved for appeal, and that Kyles never testified that McNeil confessed the murder to him. Both arguments are without merit. Lee made a proffer of McNeil’s testimony. In so doing, the preservation requirements of section 90.104(l)(b),(3), Florida Statutes (1997) are met. Additionally, a review of the transcript reveals Kyles did testify that *979 McNeil told him he committed the murder. The State has failed to meet its burden of proof, and it cannot be said that, beyond a reasonable doubt, the erroneously excluded testimony did not affect the verdict. Thus, we find the trial court committed harmful error by preventing McNeil from impeaching Kyles, and this issue was properly preserved for appellate review.

REHABILITATIVE AND OPINION TESTIMONY

Although it is unnecessary to reach the merits of the remaining two grounds advanced as justification for reversal, we address them, as harmless error on this record, to provide guidance upon retrial.
First, under Lawhorne v. State, 500 So.2d 519 (Fla.1986), it is proper for a defendant to testify on direct examination, as anticipatory rehabilitation, that he entered pleas rather than going to trial on previous charges. Lawhome was followed by Mitchell v. State, 696 So.2d 1345 (Fla. 3d DCA 1997), Ziermann v. State, 696 So.2d 491 (Fla. 4th DCA 1997); and Johnson v. State, 679 So.2d 791 (Fla. 3d DCA 1996), rev. den., 689 So.2d 1070 (Fla.1997). It is true that in attempting to rehabilitate a witness by having him testify that past convictions were obtained by guilty pleas, a party opens the door to allow the other party to question the witness about the reasons for pleading guilty. Lawhorne, 500 So.2d at 523. The difficulty this may present in certain cases is not a sufficient reason to restrict a genuine attempt at rehabilitation. Id. Ziermann explained the need for such testimony:
If the defense had been permitted to ask appellant about the substance of his prior convictions, the jury would have learned that appellant’s prior convictions concerned credit card fraud, i.e., not sexual assault type offenses. Furthermore, if appellant had been permitted to explain that he pled guilty in the prior case because he was guilty, the implied assertion would be that he was not guilty in this ease because he chose to go to trial.
696 So.2d at 491. Applied to the ease at bar, if Lee’s prior convictions were for serious crimes, the inference that Lee entered pleas to them because, unlike this case, he was guilty of those crimes, is strengthened. This allows the permissible inference that Lee admits even serious crimes when guilty. Conversely, if the prior crimes were minor, then the evidence of the nature of those crimes could indicate committing a murder would have been out of character. Either scenario certainly would be relevant to the trier-of-fact and beneficial to Lee.
Second, the admission or exclusion of lay opinion is governed by section 90.701, Florida Statutes. The statute allows a lay witness to testify about what he or she perceived in the form of inference and opinion when:
The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inference or opinions and the witness’s use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party.
§ 90.701, Fla. Stat. Additionally, this court, in Shiver v. State, stated that “in criminal cases, a witness may testify that a person was angry, threatening, or pretty mad.” 564 So.2d 1158, 1160 (Fla. 1st DCA 1990). But, “a witness should not testify to the undisclosed intention or motive of a third person.” Id., citing Branch v. State, 96 Fla. 307, 118 So. 13 (1928). The Shiver court went on to note that “the Florida Supreme Court and numerous other jurisdictions have permitted witnesses to give their opinion about another’s mental state ... provided such testimony otherwise satisfies the [section 90.701(1), Florida Statute] rule requirements that the testimony be incommunicable in the form of objective, observed facts, and not be misleading.” Shiver, 564 So.2d at 1160.
In the case at bar, Cassady testified that Lee “appeared to have something on his mind that he appeared to want to talk to somebody about” before he gave a taped statement. This testimony is forbidden by Shiver as testimony relating to the undisclosed intention or motive of a third person. It is also forbidden under section 90.701(1), Florida Statutes because, under the facts of this case, it is likely its admission could mis *980 lead the trier of fact and prejudice Lee. To admit a police officer’s testimony that Lee “appeared to have something on his mind that he appeared to want to talk to somebody about” could imply to the jury that the police officer, with his extensive law enforcement experience, could tell Lee had a guilty conscience and was, therefore, likely guilty. Lee’s “voluntary admission” of guilt was contested. Lee argued he was coerced into confessing to the murder. Because Cassa-dy’s opinion of Lee’s inner thought processes was relevant to show the voluntariness of his statements, it impermissibly tended to refute Lee’s claim of coercion, and potentially misled the trier-of-fact and prejudiced Lee.
We REVERSE and REMAND for retrial.
ALLEN, J., CONCURS.
WEBSTER, J., CONCURS IN RESULT ONLY.